UNDERWOOD VENEER COMPANY, Respondent, vs. LUCIA, Sheriff, Appellant.

*October 17—November 11, 1930.*

508

For the appellant there was a brief by *Stone & Park* and *Bird, Smith, Okoneski & Puchner,* all of Wausau, and oral argument by *R. E. Puchner.*

For the respondent there was a brief by *Brown, Pradt & Genrich,* and oral argument by *L. A. Pradt, Jr.* and *F. W. Genrich,* all of Wausau.

ROSENBERRY, C. J. It will not be necessary to set out the entire contract of May 11, 1928. By the terms of it Rolo & Son were to cut about twenty-five million feet of merchantable saw-log timber upon certain described premises, five million feet to be logged during the logging season of 1928–29. The contract then provided specifications for cutting, grading, place of delivery, decking, and the amount to be paid by the plaintiff for the logs delivered according to the contract. Rolo & Son were the parties of the first

part and the plaintiff was the party of the second part. The contract then provided:

"Due to the unfavorable logging conditions the past winter season, entailing additional expense on the party of the first part, thereby making it impossible for party of the first part to finance his operations and making it necessary for the party of the second part to finance the entire operations, as well as temporarily assuming the indebtedness accrued during the past winter's operations (1927–1928), party of the second part will have a representative in the form of a clerk, who will be assigned to this operation and who will keep full and detailed information and record covering all angles of this operation, and he only will have the power to issue and countersign orders in payment of all labor, which orders must be signed by party of the first part, and all orders covering supplies and any other equipment purchased will be recorded and ordered by party of the second part's representative. After proper record is made, same is to be mailed to the Wausau office of the party of the second part, where payment will be passed, and charged to the party of the first part."

The party of the first part agreed to co-operate in all respects. It was agreed that a reasonable supply of necessary merchandise should be kept on hand. The contract then provided:

"Party of the first part will furnish clerk's board and lodging and as part compensation for clerk's salary will equally divide the profit made on the merchandise account at the end of each fiscal year as his portion of paying clerk's salary.

"All advances upon the operations hereinbefore mentioned and described are to be justified in the judgment and in the discretion of the party of the second part, and such advances are to be charged to the party of the first part and deducted by the party of the second part in settlement."

Settlements were to be made annually. The first party agreed to build a certain road. The contract then provided:

"In case party of the first part is unable, or prevented, or for any other reason cannot perform the work herein con-

templated, satisfactory to the party of the second part, and fails to comply with the terms and conditions of this contract, or if the party of the second part finds it necessary to release the party of the first part for any reason whatever, the party of the second part in his discretion may take possession of all the logging camps and equipments, including all the camp furnishings, tools, dishes, stock of merchandise, stoves, lamps, provisions, including live stock, machinery, sleighs, horses, engines, power plant, and any and all equipment owned and used on the premises by the party of the first part, it being the intention hereby to include each and every kind and description of property, whether herein specifically referred to or not, used and usable by the party of the first part in performing the operations under this contract, and the party of the second part shall have the right to use all the said property in the completion of this contract and to retain possession of said camps and all of said property, equipment, machinery, etc., for the remainder of the term in order to complete and carry out this contract in all its particulars, without the payment of anything therefor," etc.

The contract then provided:

"And whereas the party of the second part has already advanced party of the first part the sum of approximately $16,000, and the party of the first part being indebted to the party of the second part in said sum, which is to be repaid out of the operations under this contract by the party of the first part, and in order to secure the said party of the second part in the payment of the said sum so advanced, party of the first part does hereby by these presents bargain, sell, assign, and set over unto the party of the second part all of the described goods," etc. (Description omitted.)

"It being the intention and purpose to include all property of whatever kind and description if same may be located in the camps of the party of the first part and used in the logging operations under this contract."

The remaining provisions of the contract provide for taking possession in case of default, making sale and disposition of the property, and authorizing the second party

(plaintiff) to seize the property "in case the said party of the second part shall deem itself insecure as to the indebtedness owing to it."

After the making of the new contract and at the beginning of the 1928–1929 operations, the plaintiff was represented by a clerk named Plunkett under the contract. The operations then proceeded without any further change until about January 1st, when a representative of the plaintiff by the name of Hanson appeared who had complete charge of the hauling, that is the equipment. While the logging superintendent of the plaintiff in his testimony spoke of taking possession of the Rolo property, no possession in fact was taken except such as has already been detailed. Apparently it was still the intention and purpose of the parties to work out the contract, and if at the end of the operations there was a profit over and above the amount charged against it by the terms of the contract of May 11, 1928, that profit would belong to Rolo & Son.

The trial court found that—

"About three weeks or a month subsequent to May 11, 1928, the plaintiff, Underwood Veneer Company, exercised its rights under said contract and did enter in and upon the premises where the Rolos had their camp and equipment, and did take possession of all of said equipment and did take charge of the logging operations of the Rolos under said contract. Two representatives of the plaintiff were constantly at the said camp after this, taking over the possession and control, one a superintendent and the other a clerk. The superintendent gave directions for all of the logging which was done, the manner, nature, and place of it, and had full control of the operations, and had the power and authority to fix the rate of the pay of the men employed there, and give orders as to what men should be employed, and the superintendent and the clerk between them kept all the camp accounts, gave orders for all supplies and provisions, issued time orders on behalf of the plaintiff to pay off the men also signed by Rolo which were paid directly by

the plaintiff, Underwood Veneer Company, purchased all the goods and supplies, bought and sold from the store."

And further, as a conclusion of law:

"I find the taking of possession of said property described in the complaint by the plaintiff, Underwood Veneer Company, within three weeks or a month of May 11, 1928, was an open and visible and substantial change and such as to give notice to the public that there has been an actual change of interest or ownership and possession."

The undisputed evidence is that the clerk went there under the first provision of the contract already quoted and acted in accordance with the terms of that contract. It is likewise undisputed that the logging superintendent treated this operation the same as any other done by a jobber. His directions related to the place where timber was to be cut, where roads were to be laid out, and he made inspections to discover whether or not the contract was being carried out according to its terms. He supervised this operation along with other operations and it nowhere appears that he was continuously upon this operation. He came and went after May 11, 1928, just as he had prior thereto. During the operation Mr. Plunkett, the clerk, apparently extended his authority somewhat and did something in the way of supervising, but all agreed that up to the time that Hanson came, January 1st, Rolo & Son were in charge so far as the method of work and directing the men were concerned. Hanson, who took charge of the hauling, was not a witness at the trial and his relation to the operation is not very clearly defined. The logging superintendent testified upon this point as follows:

"When the hauling season started we put our Mr. Hanson in there, who had complete charge of the hauling—all hauling; that is, the equipment."

In the opinion filed the trial court said:

"Any one coming to camp to find out who was in charge of the operations would on inquiry necessarily learn these

facts. How could any one be deceived by appearances? It seems rather clear that this was an open, visible, and substantial change of possession such as to give notice to the public, unless the public shut its eyes or made no inquiry at the place where the property was located."

Taking the situation most favorable to the plaintiff it is this: the operation proceeded exactly as it had in prior years except that the clerk in charge of the supplies and through whom the logging superintendent gave his orders was a representative of the plaintiff under the contract of May 11, 1928. There is nothing to disclose whether any one coming upon the premises would be led to make any inquiry as to whose employee this clerk was. Rolo & Son were operating under the restrictions of the contract of May 11, 1928, exactly as they had in prior years. When Hanson came upon the operation and took charge of the hauling equipment nothing occurred that would indicate a change of possession or that he was employed by some one other than Rolo & Son, whose operation it in fact was.

It is not contended on behalf of the plaintiff that it ever seized possession under the chattel-mortgage provisions of the contract, but rather that it was in possession from the time the operations began, about three or four weeks after the making of the contract of May 11, 1928. If the provision with reference to the clerk was intended by the parties to amount to possession, why does the second clause of the mortgage provide: "If the party of the second part (plaintiff) finds it necessary to release the party of the first part for any reason whatever, the party of the second part in his discretion may take possession of all the logging camps and equipment," etc.; and further provides for the use of all the material described in the contract. So the contract itself makes it apparent that the parties did not contemplate that the arrangement by which the clerk was put in charge was to constitute possession of the entire

property as against Rolo & Son, but that upon further default the plaintiff might take exclusive possession. However this is not conclusive if the plaintiff was in fact in possession within the meaning of the Michigan statute (Comp. Laws 1915, sec. 11988). That statute provides:

"Every mortgage or conveyance intended to operate as a mortgage of goods and chattels, which shall hereafter be made, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void . . . as against subsequent purchasers," etc.

The supreme court of the state of Michigan has held that a change of possession which shall be considered equivalent to the filing of a mortgage must be open, visible, and substantial. *Smith v. Greenop,* 60 Mich. 61, 69, 26 N. W. 832.

The supreme court of Michigan has further held that in the case of bulky articles there must be such clear and unequivocal designation that creditors or subsequent purchasers could not be misled or be in doubt as to the nature of the transaction. And where circumstances are such that doubt exists, such doubts must be solved in favor of subsequent purchasers or creditors. *Anderson v. Brenneman,* 44 Mich. 202, 6 N. W. 222; *First Nat. Bank v. Summers,* 75 Mich. 107, 42 N. W. 536; *Haynes v. Leppig,* 40 Mich. 602.

It is also the law of Wisconsin that in order to be effective the change of possession must be open, visible, and exclusive. *Menzies v. Dodd,* 19 Wis. 364; *Manufacturers Bank v. Rugee,* 59 Wis. 221, 18 N. W. 251; *George Walter B. Co. v. Lockery,* 134 Wis. 81, 114 N. W. 120.

The trial court in its opinion said:

"Before May 11, 1928, the Rolos were in full possession of their logging operations and equipment. They hired their men, fixed their wages, personally purchased all provisions and supplies, kept a wanigan or small store for the sale of goods to the men, purchased goods therefor and sold

therefrom, had their own timekeeper and paid their men by their own checks, and no other person was present in camp directing the operations except that plaintiff's logging superintendent periodically looked over the work and gave general directions for the cutting.

"After the change following May 11, 1928, the plaintiff had two men at the camp to represent it. They kept the time of the men and fixed their wages, kept camp accounts, gave orders for supplies and provisions, issued time orders on behalf of the plaintiff to pay all men (these were signed by the Rolos also), purchased goods for and sold from the wanigan and gave directions as to the operation of the camp. . . . Any one coming to camp to find out who was in charge of the operations would on inquiry necessarily learn these facts."

It is evident from this recital that the change which took place after the making of the contract of May 11, 1928, was a change in methods of management and not in possession of property. The very fact that one coming upon the scene of operations, wishing to know whose operation it was, would be required to make inquiry as to who was in possession, indicates that possession which was from the beginning in the Rolos had not been changed in a way to make the change of possession open and visible to third parties. The most that can be said, and even that is doubtful, is that the plaintiff and Rolo & Son were in joint possession of the property. Even if that were true it is not sufficient. The possession must be exclusive. No signs were erected at the store or headquarters. No marks were put upon the property and nothing was done other than to change the method of operations, and this change was of a character which would not be likely to attract the attention of a stranger to the situation coming upon the premises. We are urged to sustain the judgment on the ground that the plaintiff acted in good faith. It is quite evident that the plaintiff did act in the utmost good faith and tried to help the contractor out of his financial difficulties. The statute, how-

ever, makes no exception based upon that ground. The only thing that saves a mortgagee's rights when he fails to record his mortgage is open, visible, and exclusive possession. We are obliged to hold that the plaintiff was not in open, visible, exclusive possession of the property. The chattel mortgage was therefore void as to third parties and the sheriff properly levied upon the property in question and is entitled to its possession.

*By the Court.*—Judgment appealed from is reversed, and cause remanded with directions to enter judgment dismissing the plaintiff's complaint and in accordance with this opinion.