The Manufacturers' Bank of Milwaukee vs. Rugee.

THE MANUFACTURERS' BANK OF MILWAUKEE VS. RUGEE.

*December 11, 1883 — January 8, 1884.*

SALE OF CHATTELS: MORTGAGE. *(1) Bill of sale may be shown to be mortgage. (2) Evidence. (3) What delivery essential.*

1. A bill of sale of chattels, absolute on its face, may be shown by parol evidence to be a mortgage. And such fact may be shown on behalf of one, not a party to the instrument, having a subsequent lien on the property.
2. Upon the evidence in this case (stated in the opinion) a bill of sale to a bank of the books, furniture, etc., in a law office, is *held* to have been intended as a mortgage. Evidence that the amount credited to the vendor as the purchase price was allowed to stand on the books of the bank as a debt against him, and that notes were taken for the whole or a part thereof, was admissible.
3. The delivery which is necessary to make a sale or mortgage of chattels valid as against creditors of the vendor or mortgagor, must be actual and the change of possession continued. R. S., secs. 2310, 2313. The evidence in this case is *held* not to show such a delivery.

APPEAL from the Circuit Court for *Milwaukee* County. Replevin. The facts are stated in the opinion. The cause was tried by the court, a jury having been waived. From a judgment in favor of the plaintiff the defendant appealed.

For the appellant there was a brief by *Johnson, Rietbrock & Halsey*, and oral argument by *Mr. Johnson*.

For the respondent there was a brief by *Cottrill & Hanson*, and oral argument by *Mr. Cottrill*.

ORTON, J. This is an action of replevin, and the goods were taken on the writ. The complaint alleges that the plaintiff was the owner and entitled to the possession thereof, and that the defendant wrongfully took and wrongfully detains the same. The answer denies that the plaintiff was or is the owner, or entitled to the possession, of the property, and denies that he wrongfully took or wrongfully detains the

same. The answer further admits the taking and detention of the property, and justifies the same, alleging that the defendant did so, as sheriff of Milwaukee county, by virtue of a writ of attachment in favor of one Guido Pfister against one Harold Emmons, who was then the owner of said property. The property consisted of standard law books and law magazines, Lincoln's Speeches and Life, Gray's Anatomy, miscellaneous books, two sets of books not named, two bank directories, History of Milwaukee, railroad map, three desks, one safe, five office chairs, one eight-day clock, table and letter-press, one 'carpet, and a book-case. This property was the library and furniture of the law office of said Emmons, and when taken by the defendant it was in his office.

On the trial, to prove title in the plaintiff, a bill of sale in the usual form from said Emmons to the plaintiff, dated September 12, 1881, of the above-described property, together with a law docket, umbrellas, a rubber coat, water-pail, towels, coal-scuttle, printed stationery, gas fixtures, notary seals, etc., constituting all of the movable property in said law office, of every name and description, was introduced in evidence. The consideration named therein is $600. The plaintiff undertook to prove that it took possession of the property under this bill of sale, and its continued possession thereof to the time of the levy of the attachment, by the testimony of W. S. Candee, the cashier of said bank, by and through whom the business was transacted. His testimony was, in substance, that three or four days after the execution of the bill of sale he called upon Emmons, the vendor, " for the purpose of seeing the property described in the bill of sale," and that that was his business there. He asked Emmons to show him the property, " which he did or pretended to do." He then said to him, " This, then, is our property?" Emmons said, "It is." He then said to Emmons, " You hold it in trust for us; keep it carefully, and see that it is not injured." Emmons then said, "Here it is,"

and pointed to the books on the shelves, and to the furniture and fixtures *supposed* to be those conveyed by the bill of sale. He then said to Emmons, "This, then, is our property;" and Emmons said, "It is." He then charged him to keep it in safety and good order, which he said he would do. He went there for the purpose of receiving a delivery of the property. It appears by other testimony in the case that so the property was left, and remained with Emmons until the service of the attachment on the 11th day of September, 1882, one year thereafter, and that in the meantime Emmons had twice removed his office, together with this property, and all the time used it as he had been accustomed to do before the giving of the bill of sale, and kept up the reports and the law journals as before, and had loaned the books and otherwise treated the property as his own, without any objection or interference of the plaintiff. The instrument, in form a bill of sale, was not filed with the city clerk as a mortgage until November 20, 1882, after the attachment was served and levied upon the property. At this period the two first questions in the case in their natural order will be disposed of.

1. Is the doctrine that a deed absolute on its face may be proved to be in fact a mortgage, applicable to bills of sale of personal property, and may a creditor so prove, in order to enforce a subsequent lien upon the property? It is said in Herman on Chat. Mortg., 48: "A bill of sale of chattels may be shown to be a mortgage by the same evidence that would produce that effect in case of an absolute conveyance of real estate." This text is supported by a note, in which are cited nearly 200 cases to that effect, and many of them are cases in which a creditor having a lien, or other third person, was the contestant. In *Rockwell v. Humphrey*, 57 Wis., 410, which was a contest between the vendee of what was claimed to be a bill of sale or a conditional sale and a subsequent mortgagee, it was allowed to be shown

that the instrument was a mortgage, and should have been filed as such. In all such cases the contest is between creditors, the first insisting that the instrument is an absolute bill of sale, and the second contending that it was, in fact, a mortgage, and void as to him for want of either a delivery of the property or of the filing of the instrument as a mortgage. It would be, indeed, a shield to protect a favored creditor against all other creditors and mortgagees, if such creditor could so use a bill of sale which was in fact a security for the payment of money and a mortgage, and other creditors or mortgagees could not assault or attack it. As a bill of sale it might be valid with no change of possession or delivery of the property; while as a mortgage it would be invalid as to them without such delivery or the filing of the instrument. The parties to such a bill of sale are in such case both interested in having it a bill of sale, and creditors or mortgagees are the only ones interested against it, and it is not likely that the vendor would seek to prove it a mortgage for the benefit of his other creditors. The doctrine is of far more advantage to creditors, and there is not one good reason why they may not avail themselves of it in a proper case, and such is eminently the case at bar.

In *Caswell v. Keith*, 12 Gray, 351, the sheriff had taken the goods as the property of A., and B. sued him in tort, as claiming to be the owner of the property, purchased long before the levy from A., by an absolute bill of sale. The sheriff, as defendant, was allowed to show that the bill of sale was, in fact, a mortgage and security for money. In *Hodges v. Tenn. M. & F. Ins. Co.*, 8 N. Y., 416, the plaintiff had become the purchaser by absolute deed of the insured property, and held an assignment of the policy and sued for the loss. The defendant was allowed to show the deed and assignment a mere mortgage security, and that the plaintiff was not the owner of the policy. I think it safe to say that a very large majority of cases in respect to chattel mort-

gages are those in which others than the mere parties to the bill of sale have been allowed to prove the bill of sale a mere mortgage. A creditor having a lien upon the property subsequent to the bill of sale has another reason and interest to prove it a mortgage than as establishing his right of redemption, in that he may invalidate the instrument as a mortgage for want of delivery or filing, and thus enforce his lien as prior, when, as said before, if it is in fact a bill of sale it may be valid, if *bona fide* and without intent to defraud, without a delivery or change of possession; only the *onus* of proving it *bona fide* and free from fraud is cast upon the vendee. Sec. 2310, R. S. I have devoted more space to this question than its intrinsic character, resting in reason, would seem to demand, because the learned counsel of the appellant in his brief seems to be so positive in his position that the doctrine of allowing parol proof that a deed of land was intended as a mortgage had never been applied to bills of sale of chattels, and that in neither case could such a question be raised. except by the parties to the deed or bill of sale.

2. Was there a delivery of the property to the plaintiff, and a continued change of its possession, under the pretended bill of sale? From the above evidence it would seem that the plaintiff, or Mr. Candee, its cashier, who did the business at the time of the execution of the instrument, did not know what the property really was. He went to the office of Emmons "for the purpose of seeing the property described in the bill of sale," and had to inquire of Emmons what and where it was; and this was three or four days after the instrument had been signed and delivered. The cashier then made but a casual inspection of the property, and cast a mere glance about the room, and may have taken down a book to look at, but not as an emblem or symbol of delivery. All there was of it, according to the testimony, was that the cashier inquires where and what the property was, covered by the bill of sale, and Emmons says, "Here,

or there, it is," and the cashier said, " Well, you keep it, or hold it in trust for us, and keep it carefully, and see that it is not injured," and the property remained precisely as it was, and under the control of Emmons and in his use, as before. There was no manual delivery, no setting apart of the property, no verifying the identity or description of any of it with the list appended to the bill of sale, and Emmons does not even say he *delivers* the property, or intends to do so, and there was no visible change of possession of any of it, actual or by symbol, to indicate the plaintiff's future dominion over it. Emmons afterwards treats the property as his own, moves it twice to other premises, keeps up his reports and law magazines, loans the books to others, and freely uses many of the articles which must perish or be greatly depreciated by the using, and this condition of things continues a year without the assertion of any further claim upon the property by the plaintiff. There was not even a constructive delivery of the property, and there was no change of either the actual or constructive possession. But even a symbolical or constructive delivery in such a case is of no avail where an actual delivery is practicable. The delivery must be actual, and such as the nature of the property will admit. Herman on Chat. Mortg., 199, and note. The delivery of the property in *Ganson v. Madigan*, 15 Wis., 144, was more complete, and yet it was held, even between the parties, that there was no delivery at all. In *Grant v. Lewis*, 14 Wis., 487, it is held that if the property is left in the possession of the vendor as agent of the vendee, or in any capacity whatever, there is no such actual change of the possession as the statute contemplates in order to rebut the presumption of fraud.

But, as claimed by the learned counsel of the appellant, the case of *Menzies v. Dodd*, 19 Wis., 343, is precisely in point. That was a contest between two mortgagees, and the first mortgagee sought to prove a delivery and a continued

change of the possession to obviate the necessity of renewing the filing of the mortgage. In the opinion of Chief Justice DIXON in that case it is held — *First,* that the section of the statute, which is now sec. 2310, R. S., requiring the sale to " be accompanied by an immediate delivery, and to be followed by an actual and continued change of possession of the things sold," is applicable, so far as delivery and actual and continued change of possession are concerned, to a contest between mortgagees; and, *second,* that there must be the same clear, unequivocal, and exclusive change of possession as is required by said section, and that there seems to be no decision in which even ponderous or bulky articles are made an exception; and further, in precise point with this case, that such a delivery cannot be made by *mere words.* There are many cases in this court of the same import, which need not be here referred to, and some of them will be found in the head-note of the above case. In other states the cases are numberless to the same effect, but I do not feel at liberty to cite any of them to swell the volume of our reports, when the identical question has been so often decided by this court.

But the language of sec. 2313, R. S., in respect to chattel mortgages, that no mortgage shall be valid except between the parties, " unless the possession of the mortgaged property *be delivered to and retained* by the mortgagee, or a copy thereof filed," etc., has nearly, if not quite, the same force. There must be an actual delivery of the possession to the mortgagee, and that possession *retained* by him. The evidence in this case is very far from showing such a change and continued change of the possession as the statute and the above authorities require. This court has decided over and over again that a chattel mortgage, unless so accompanied by an actual delivery and a continued change of possession, or unless filed as the statute directs, is void as to all persons except the parties thereto, and such is the express

provision of the statute, and to cite the decisions of this court, and the courts of other states under a similar statute, would be a waste of time and space.

This case was not tried on the theory that the sale, if absolute, was fraudulent, and for that reason void, but on the theory that the bill of sale, though absolute in terms, was intended by the parties to it to have the effect of a mortgage only, and is, in fact, a mortgage; and because it was not accompanied with such a delivery and change of possession, or was not filed as the statute requires, it was invalid as against the attachment. This leads us to the last question in the case,— whether this bill of sale was intended to have the effect of a mortgage, or security for a loan of money or for a debt, past, present, or future; or, in other words, whether this bill of sale, though absolute in terms, is in fact a mortgage. As we have already seen, parol evidence may be resorted to to prove this fact, and on such evidence in this case it would appear to have been very conclusively shown that a mortgage, and nothing but a mortgage, was contemplated or intended by this pretended bill of sale. (1) It was very *improbable* that an absolute sale was intended. Neither the bank nor its cashier, who transacted the business, knew, until three or four days after the execution and delivery of the instrument, anything of the property, or what was its character, quality, or value; for Candee, the cashier, testified that he went to Emmons's office expressly to find out and see what the property was which had been conveyed to the bank. Is it probable that a bank or its officers would purchase absolutely and pay cash down for property of this kind, to the amount of $600, without knowing anything about it or seeing it? The bank might take a mortgage upon it to secure a debt or a loan without seeing it, on the representation of the mortgagor, but would hardly purchase this class and variety of property, to be owned absolutely by the bank, in that way. (2) It is very

improbable that the bank would buy, to own absolutely, for its own use, these various articles of property, such as the bust of Lincoln, book-cases, and carpets on the floor, spittoons, office chairs, pieces of oil-cloth, a flower vase, notary seals, printed stationery only for use in a lawyer's office, a soap-dish and towels, a rubber coat, a law docket, etc., together with a library of law and miscellaneous books. Such a purchase would be outside the common usage, and in violation of the ordinary rules of banking, and the stockholders and depositors of the bank might well complain of such a wasteful, extravagant, and illegitimate purchase by the bank, and such a use of the moneys of the bank, intended only to be used in loans and discounts, and for other proper and legitimate purposes. It would require strong evidence to prove that such a transaction was a purchase, and not a security only, against such strong improbability of a purchase.

But the testimony of the cashier, Candee, is amply sufficient to show that a mortgage only was intended. His testimony was that the $600 consideration was credited to Emmons on the bank books, *less the interest*, and Emmons was allowed to draw on this fund; and that "if Emmons offered the bank $600 the bank would probably give him back a conveyance of them," meaning the books and other articles. When asked whether it was his understanding that Emmons should have the privilege of buying back the property for the $600, he replied, "I think it might have been;" and when asked whether the bill of sale was a security for the $600, he first replied, "We held the books as such security, if either," but he afterwards, when closely questioned, denied this, and insisted that it was a sale, and that the bank owned the property and did not hold it as security. But subsequently, when speaking of the credit given to Emmons of the $600, he said, "He executed this bill of sale to us at the same time, and as a consideration for the *credit*." When

The Manufacturers' Bank of Milwaukee vs. Rugee.

. asked what they were going to do with the books, he flippantly replied, "Put them in my library as an ornament." He further testified that "Emmons wished the care of the books until we wanted them, and for his accommodation *we took possession instead of filing the bill of sale,* and that was why *we did not file the bill of sale.*" This last testimony is nearly conclusive that the parties regarded the bill of sale as a mortgage, which had to be accompanied by an actual delivery, or to be filed with the city clerk, in order to be valid. The language is inconsistent with any idea of an absolute sale.

Take the whole transaction together, it is too clear for argument that this was a mere credit or loan to be secured by this instrument and a pretended possession of the property, in lieu of filing it with the city clerk according to the statute relating to chattel mortgages. This pretended bill of sale being, in fact, a mortgage to secure a loan of $600 from the bank, and there never having been any delivery of the possession of the mortgaged property to the bank, and the instrument never having been filed with the city clerk until long after the attachment was served, it follows that the instrument or conveyance, as a mortgage, was void as to the creditor and plaintiff in the attachment, and as to the defendant; and that the plaintiff in this action proved no title to the property or right to the possession thereof; and that the defendant did not wrongfully take and wrongfully detain the same.

Germane to this question on the facts, the circuit court committed a grave error in rejecting evidence tending to show that the credit given to Emmons was allowed to stand on the books of the bank as a debt against him, and as an existing indebtedness independent of such credit, and that notes were taken for the whole or some part thereof. This was a vital issue in the case, and the evidence was clearly competent.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with direction to make and file the proper findings of the issues in the action in favor of the defendant, according to this opinion, and enter the proper judgment in favor of the defendant.